# IN THE UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF ILLINOIS
### SPRINGFIELD DIVISION

| | | |
|---|---|---|
| JOSEPH M. CODY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No.  09-3060 |
| | ) | |
| MICHAEL J. ASTRUE, | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

## OPINION

Plaintiff Joseph M. Cody appeals from the denial of his application for Social Security Disability Insurance Benefits (Disability Benefits).  42 U.S.C. §§ 416(I), 423.  This appeal is brought pursuant to 42 U.S.C. § 405(g).  For the reasons set forth below, the Decision of Defendant Commissioner of Social Security is reversed and remanded.

## STATEMENT OF FACTS

Cody was born on January 6, 1956.  He completed the twelfth grade. He formerly worked as a printing press operator.  He stopped working on December 10, 2003.  In August 2007, he tried working a desk job at a collection bureau, but quit after four days because of back pain.  <u>Answer to</u>

Complaint (d/e 4), attached Certified Transcript of Proceedings Before the Social Security Administration (R.), at 79A, 160.

Cody suffered from osteoarthritis in his knees, degenerative problems in his back, and a left shoulder injury. Dr. Karolyn Senica, M.D., performed a left knee arthroscopy with medial meniscectomy on Cody in December 2002. R. 503. Cody had significant degenerative arthritis in his knee. R. 503.

On July 24, 2003, Cody injured his left shoulder at work. Cody saw Dr. Senica, who referred him for physical therapy. In August 2003, Dr. Senica also injected Hyalgan into Cody's knees to relieve pain from the arthritis. R. 411. Cody started the physical therapy on his shoulder on August 26, 2003. R. 401-06. Cody was ultimately referred to Dr. Rodney Herrin, M.D., for shoulder surgery.

On December 11, 2003, Dr. Herrin performed a left shoulder arthroscopy on Cody. R. 509. Cody went to see Dr. Herrin again on April 12, 2004. At that time, Dr. Herrin recommended that Cody continue physical therapy sessions. R. 504. Cody continued physical therapy sessions through August 2004. R. 282-469.

On April 13, 2004, Cody went to see Dr. Senica for his knees. Cody

was six feet tall and weighed 300 pounds.  Dr. Senica's treatment notes state that Cody walked with a limp and had moderate joint effusion.  She found tenderness along the medial joint line, medial femoral condyle and along the medial patellofemoral articulation.  R. 503.  X-rays showed nearly bone on bone deformity involving the medial compartment, and also, some patellofemoral arthrosis with osteophyte formation in joint space narrowing as well.  Dr Senica diagnosed degenerative arthritis of the left knee, moderately severe.  The notes state, "I also discussed with him how important weight loss would be for his knees as well."  R. 503.

On May 25, June 1, and June 8, 2004, Dr. Senica administered Hyalgan injections into Cody's left knee to relieve the pain.  R. 499-501.  Dr. Senica noted that she informed Cody's physical therapist that he should avoid deep squats, kneeling or climbing stairs.  Dr. Senica told the therapist that lifting would be all right if Cody was not required to bend over or squat.  Dr Senica told the therapist that normal walking was okay.  R. 500.

After Cody's June 2004, work hardening physical therapy session, Cody's physical therapists reported that Cody was performing at a "medium physical demand level in terms of lifting floor to tabletop height, however lifting tolerances decrease significantly when approaching shoulder height.

R. 459.  The therapist also stated that Cody's "ability to reach to lower levels is compromised . . . due to ongoing treatment of left knee dysfunction."  R. 459.  The physical therapist also noted that Cody performed the exercises during the physical therapy session with little or no antalgic behavior.  R. 457.  The June 14-18, 2004, physical therapy summary stated that Cody could walk for one to one and one-half miles at a quick pace.  R. 454.

Cody went to see Dr. Senica on August 3, 2004.  At that time Cody walked without a significant limp.  Cody did not have any significant joint effusion.  He still had some tenderness and pain.  Dr. Senica told Cody that he was in a difficult situation because he already had arthroscopy and Hyalgan shots and he was too young for knee replacement surgery.  Dr. Senica prescribed Bextra, an anti-inflammatory.  Dr. Senica also noted, "He really needs to work on weight loss."  R. 497.

On August 5, 2004, Cody's physical therapist issued an Occupational Therapy Report.  The report stated that Cody weighed 319 pounds.  R. 420. The report included a functional capacity evaluation.  R. 418.  The functional capacity evaluation recommended that Cody could sit for four to six hours in a workday, stand for four to six hours in a workday, walk three

to five hours in a workday, occasionally lift 35 pounds to shoulder height and 15 pounds overhead, and occasionally carry 50 pounds. R. 418. On August 12, Dr. Herrin wrote on a prescription pad that the limitations set forth in the August 5, 2004, report were permanent work restrictions for Cody. R. 471.

Cody went to see Dr. Senica on August 19, 2004, after he injured his right knee. Dr. Senica found a small joint effusion and possible tear of the medial meniscus in the right knee. X-rays also showed some mild to moderate joint space narrowing and some patellofemoral arthritis with some small osteophytes and some mild narrowing. R. 494.

On September 24, 2004, Dr. Senica wrote a note listing work restrictions for Cody. Dr. Senica stated that he needed to avoid climbing ladders, kneeling, squatting, running, jumping, and high impact activities. Dr. Senica stated that he needed to limit his use of stairs, should not stand for more than one hour at a time, and should lift no more than twenty-five to thirty pounds. R. 470. She stated that Cody would do best with a desk job. R. 470.

On December 22, 2004, Cody filed his application for Disability Benefits. Cody alleged that he had been disabled since December 10, 2003.

R. 79A.

On January 26, 2005, Cody was examined by agency physician Dr. Vittal V. Chapa, M.D. Cody weighed 334 pounds at the time of the examination. Dr. Chapa found crepitation in both knees, but full range of motion in Cody's hips and knees and no difficulty with ambulation. Cody had decreased range of motion in his left shoulder and full range of motion in his right. Cody had good hand grip bilaterally and could perform both fine and gross motor manipulations with both hands. Dr. Chapa diagnosed status post bilateral shoulder surgery, decreased range of motion of left shoulder, and osteoarthritis in both knees. Dr. Chapa did not have any medical records to review before examining Cody. R. 483-85.

On February 9, 2005, Dr. Towfig Arjmand, M.D., reviewed the medical records and prepared a Residual Functional Assessment of Cody. Dr. Arjmand noted that Cody weighed 334 and had a body mass index (BMI) of 34.1. R. 519. Dr. Arjmand opined that Cody could perform light work with occasional postural limitations and overhead reaching with the left arm. R. 513-15. On June 15, 2005, Dr. Vidya Madala, M.D., concurred with this assessment. R. 521.

On February 22, 2005, Cody went to see Dr. Senica for knee pain.

Cody weighed 325 pounds at the time of this examination. Cody walked with a limp. X-rays showed "basically bone-on-bone deformity involving the medial compartments" of both knees. R. 492. His left knee was worse because of osteophyte formation. Cody had patellofemoral arthrosis bilaterally with narrowing and osteophyte formation. Dr. Senica concluded that Cody had severe degenerative arthritis in both knees and moderate to moderately severe patellofemoral arthrosis. R. 492. Dr. Senica prescribed anti-inflammatories, and stated she would try to get insurance approval for more Hyalgan injections, but that if these treatments did not work he would need knee replacement surgery. She also stated, "In addition, he really needs to work on weight loss and this was discussed with him again at length today." R. 493.

On June 7, 2005, Cody saw Dr. Senica again. R. 544-45. Dr. Senica stated in her notes that Cody suffered from severe pain, had extreme difficulty getting out of the chair, could not walk, had pain at night, experienced poor sleep, and had trouble with stairs. She found that he had difficulty getting out of a chair, walked with a limp and had joint effusion. Dr. Senica recommended total knee replacements. She also stated, "We, again, discussed about weight loss, which I think would be very important

for this gentleman given that he is going to need to have joint replacement." R. 545.

On August 10, 2005, Cody went to see Dr. Michael Comerford, M.D., complaining of back pain. Dr. Comerford believed the pain was associated with his knee problems. Cody had clinical signs of muscle stiffness in his back. R. 527-28. Dr. Comerford saw Cody again on August 18, 2005, in preparation for knee replacement surgery. R. 525. On August 25, 2005, Dr. Senica went ahead and performed a left knee arthroplasty on Cody. R. 539-41.

On October 12, 2005, Cody went to see Dr. Senica again. He was walking with a cane, limping, and was in a stooped-over position. X-rays of his back showed degenerative scoliosis, multi-level degenerative disk disease with narrowing, osteophyte formation, and significant facet arthropathy. R. 534. Dr. Senica scheduled Cody for right knee replacement. She also referred Cody to Dr. Timothy VanFleet, M.D. for treatment of his back. R. 535.

On November 2, 2005, Cody saw Dr. VanFleet. Based on his examination and X-rays and an MRI, Dr. VanFleet found that Cody had lumbar spinal stenosis, degenerative disk disease, and back pain. He

recommended exercise. He noted that Cody was planned to undergo a right knee replacement. R. 617.

On November 10, 2005, Dr. Senica performed a right knee arthroplasty on Cody. R. 551. Dr. Senica appended to her operative notes a page from a Department of Health and Human Services BMI calculator. The calculator stated that Cody was six feet tall, weighed 339 pounds and had a BMI of 46. The page further stated that a person with a BMI of more than 30 is considered obese. R. 554.

Cody saw Dr. VanFleet again on December 28, 2005, complaining of continued back pain. Dr. VanFleet discussed options with Cody, and Cody elected to have back surgery. R. 615.

On January 26, 2006, Dr. VanFleet performed L2, L3, L4, and L5 laminectomies on Cody. R. 558. Dr. VanFleet's surgical notes stated that Cody had stenosis and lumbar radiculopathy. R. 558. Dr. VanFleet stated that Cody was "highly stenotic" at L2-3 and L3-4. R. 559.

Cody went to Dr. VanFleet in March 3, 2006. Dr. VanFleet stated that Cody stood and ambulated without difficulty. Dr. VanFleet stated that Cody had improved dramatically. Dr. VanFleet released Cody from his care and referred him to physical therapy. R. 613. Cody attended physical

therapy sessions from March 14, 2006, to April 26, 2006.  R. 568-88.

On August 23, 2007, Dr. Comerford wrote a letter to Cody regarding his condition.  R. 590.  Dr. Comerford stated, in part, that surgeries and physical therapy measures did not result in "any significant improvement in chronic low back pain."  R. 590.  Dr. Comerford also stated that Cody tried the debt collection job, but was not able to do the job because he could not sit for long periods of time.  Dr. Comerford recommended seeking permanent disability "as you have been unable to improve your level of functioning such that you would be employable with the amount of back pain that you have."  R. 590.

On September 13, 2007, Cody went to Dr. Edward Trudeau, M.D., for EMG and nerve conduction studies.  He was referred by Dr. VanFleet. Dr. Trudeau found no evidence of nerve root compression.  He found sensory motor neuropathy, and mild right L4 radiculopathy, but no other neurological problems.  R. 625-26.

On September 21, 2007, Cody saw Dr. VanFleet again for back pain. Dr. VanFleet reviewed the EMG studies from Dr. Trudeau and found that Cody had neuropathy and lumbar degenerative disk disease with post-laminectomy syndrome.  Dr. VanFleet recommended medication and

exercise.  <u>R.</u> 640.

The Administrative Law Judge conducted an evidentiary hearing on February 11, 2008.  <u>R.</u> 643-73.  Cody appeared with his lawyer.  Cody and vocational expert Bonnie Gladden testified at the hearing.  Cody testified that he weighed 365 pounds at the time of the hearing.  He was married and lived with his wife in a one-story ranch house.  His children were grown and did not live with him.  <u>R.</u> 647-48.

Cody testified that he completed the twelfth grade.  He worked as a pressman until his shoulder injury in 2003.  <u>R.</u> 651-52.

Cody testified that his wife worked for the State of Illinois and the two of them owned some rental property.  <u>R.</u> 649.  He testified that he mowed the grass on his property and drove about ten miles a day.  He went on trips to places within a ten-mile radius such as his son's house and the grocery store.  <u>R.</u> 653.  He testified that he took care of his personal hygiene, except that his wife helped him out of the tub.  <u>R.</u> 654.  Cody said that he did not have any hobbies.  <u>R.</u> 653.[1]

---

[1]The ALJ also asked Cody about an anonymous caller who claimed that he performed all the maintenance on his rental property and engaged in other activity, and also about an inspector general investigation arising from the call.  <u>R.</u> 654-59.  The ALJ ultimately did not consider either the call or the results of the investigation in his decision.  <u>R.</u> 24.

Cody testified that he did not do any maintenance work on the apartments.  He said that his wife and son did some of the maintenance work and he hired professionals to do some of the work.  R. 658-59.  Cody testified that the tenants dropped off the rent checks at their house next door.  Cody entered a record of receipt of the checks on their computer.  He also entered a record of expenditures for the properties on their computer.  He testified that from there, his wife did the bookkeeping.  He testified that an accountant did their taxes.  R. 670-71.

Cody testified that his wife ran a craft business.  He got scrap wood for her from a local finish millwork business.  He said he would spend about thirty minutes a day cutting the wood into pieces for her.  She would then assemble the items.  R. 658, 666.  Cody said that he earlier stated that he did not have any hobbies because he did not view cutting the wood for his wife as a hobby.  R. 660.  He also said that he and his wife had been in several automobile accidents and received insurance settlements from those accidents.  R. 662-63.

Cody's attorney asked Cody about his current condition.  Cody stated that he still suffered from severe back pain.  Cody stated that his doctors said that the condition was degenerative and further surgery would not help.

R. 665.  Cody testified that he took pain medication, such as Tramadol or hydrocone, a minimum of three times a day.  R. 665.  He said that his pain was a 5 or 6 on a scale of 10 with the medication.  He said that he could bend forward slightly, but could not stoop, squat or kneel.  R. 665-66.  Cody stated that he soaked in a bathtub to relieve some of the pain so that he could go to sleep at night.  R. 669.  Cody testified that he also has sleep apnea and restless leg syndrome and only sleeps four or five hours a night R. 665-66.

Cody testified that in a typical day he did about 30 minutes of woodworking, watched TV, and vacuumed.  He said that he vacuumed one room at a time and then had to rest.  When he rested, he sat with ice packs on his back.  He often dozed off when resting.  R. 668.  Cody testified that he helped his wife with the cooking by doing some of the prep work.  R. 669.  He would also drive on short trips four to seven days a week.  He went to church regularly.  R. 666.

Cody testified that he weighed 275 pounds when he stopped working in 2003, but now weighed 365 pounds.  He could not explain the increase.  He thought some of his medications may have caused some of the weight gain.  R. 668.  He said that he discussed a lap band procedure with doctors.

R. 667.  He said that he tried exercising on a tread mill and stationary bicycle, but the pain in his knees and back was too great.  He testified that he could walk a couple hundred yards.  R. 667.

The vocational expert Gladden then testified.  The ALJ asked Gladden:

> I'd like you to assume we have an individual the same age, education and experience as the claimant.  This individual is limited to light exertional work, occasional postural limitations, occasional overhead reaching with the left arm.  How would these restrictions affect the performance of the claimant's past relevant work?

R. 671.  Gladden testified that the person could perform Cody's past work as an offset press operator.

The ALJ and Gladden then had the following colloquy:

> Q.   Um-hum.  If we were to reduce the exertional level to sedentary, how would that affect that job?
>
> A.   It could not be performed.
>
> Q.   Would there be other jobs in the economy such an individual could perform?
>
> A.   There is that of a packing and sewing machine operator, 920685078, at the sedentary level there's approximately 3,000 in the state of Illinois.  There would be that of an assembler of small products, 706687010, that at the sedentary level is approximately 7,000 in the state of Illinois.
>
> Q.   Could these positions be considered a representative

sampling or an exhaustive list?

A.   They are representative sampling.

Q.   If we were to add a sit/stand option, how would that affect the two positions you just mentioned?

A.   The assembly work could be performed and I do believe that the packing and filling machine could be performed, the sedentary levels could be performed either sitting or standing.

R. 671-72.  Cody's attorney did not question Gladden.  The hearing then concluded.

The ALJ issued his Decision on March 13, 2008.  R. 20-29.  The ALJ followed the five-step Analysis set forth in the Social Security Administration regulations (Analysis).  20 C.F.R. §§ 404.1520, 416.920. Step 1 requires that the claimant not be currently engaged in gainful activity. 20 C.F.R. §§ 404.1520(b), 416.920(b).  If true, Step 2 requires the claimant to have a severe impairment.   20 C.F.R. §§ 404.1520(c), 416.920(c).   If true, Step 3 requires a determination of whether the claimant is so severely impaired that he is disabled regardless of his age, education, and work experience.  20 C.F.R. §§ 404.1520(d), 416.920(d). Such severe impairments are set forth in the Listings.  20 C.F.R. Part 404 Subpart P, Appendix 1.  The claimant's condition must meet the criteria in

a Listing or be equal to the criteria in a Listing. 20 C.F.R. §§ 404.1520(d), 416.920(d).

If the claimant is not so severely impaired, then Step 4 requires the ALJ to determine whether the claimant is able to return to his prior work considering his residual functional capacity (RFC). 20 C.F.R. §§ 404.1520(e), 416.920(e). If the claimant cannot return to his prior work, then Step 5 requires a determination of whether the claimant is disabled considering his RFC, age, education, and past work experience. 20 C.F.R. §§ 404.1520(f), 416.920(f). The claimant has the burden of presenting evidence and proving the issues on the first four steps. The Commissioner has the burden on the last step; the Commissioner must show that, considering the listed factors, the claimant can perform some type of gainful employment that exists in the national economy. Knight v. Chater, 55 F.3d 309, 313 (7th Cir. 1995).

The ALJ found that Cody met his burden at Steps 1 and 2. He has not engaged in substantial gainful activity and he suffered from the severe impairments of degenerative disk disease and osteoarthritis in both knees. R. 22. At Step 3, the ALJ concluded that Cody did not meet any Listing. R. 23.

At Step 4, the ALJ found that Cody had the RFC to perform light work subject to occasional postural functions and occasional overhead reaching with his left arm. In making this finding, the ALJ relied on Cody's testimony regarding his daily activities, the physical therapy evaluations in 2004, Dr. Chapa's examination, and Dr. Arjmand's RFC assessment. The ALJ found that Cody's claims about the severity of his symptoms were not credible in light of this evidence. R. 24-27. The ALJ did not consider the anonymous caller's claims or the subsequent investigation because the investigation "was poorly conducted and inconclusive." R. 24.

The ALJ discounted Dr. Comerford's opinion in his August 23, 2007, letter because Dr. Comerford relied on Cody's subjective complaints and Dr. Comerford's opinions were inconsistent with the medical evidence on which the ALJ relied. R. 27.

The ALJ then determined at Step 4 that Cody could perform his past relevant work as a pressman. The ALJ relied on Gladden's opinion in reaching this decision. R. 28.

The ALJ stated, further, that even if Cody could not perform his past relevant work, he could perform a significant number of other jobs in the national economy. R. 28. In making this determination at Step 5 of the

Analysis, the ALJ started with the Medical-Vocational Guidelines (Rules). 20 C.F.R. Part 404, Subpart P, Appendix 2. The ALJ said that the Rules would find that Cody was disabled if he could perform all levels of light work. The ALJ cited Rule 202.21. R. 28. Rule 202.21 applies to younger individuals aged 45-49 years who completed high school, worked at skilled or semiskilled jobs, but the skills were not transferable, and who was limited to sedentary work. According to Rule 202.21, such a person is not disabled. The ALJ then relied on Gladden's testimony to address whether Cody's additional limitations of occasional postural functions and occasional overhead reaching with his left arm would affect the Analysis at Step 5. Based on Gladden's testimony that a person with these limitations could perform various jobs in the national economy, the ALJ found that the Commissioner met his burden at Step 5. R. 29.

Cody appealed the Decision of the ALJ. The Appeals Council denied Cody's request for review. Cody then brought this action.

## ANALYSIS

This Court reviews the ALJ's Decision to determine whether it is supported by substantial evidence. Substantial evidence is, "such relevant evidence as a reasonable mind might accept as adequate" to support the decision. Richardson v. Perales, 402 U.S. 389, 401 (1971). This Court must accept the ALJ's findings if they are supported by substantial evidence, and may not substitute its judgment for that of the ALJ. Delgado v. Bowen, 782 F.2d 79, 82 (7th Cir. 1986). The ALJ further must articulate at least minimally his analysis of all relevant evidence. Herron v. Shalala, 19 F.3d 329, 333 (7th Cir. 1994). The Court must be able to "track" the analysis to determine whether the ALJ considered all the important evidence. Diaz v. Chater, 55 F.3d 300, 308 (7th Cir. 1995).

Cody argues that the ALJ erred by failing to include in his Analysis the evidence of Cody's obesity and the impact of his obesity on his severe impairments. The Court agrees. Listing 1.00Q states that the impact of obesity must be considered at Step 3 and at other Steps in the Analysis, including the determination of the claimant's RFC:

> Obesity is a medically determinable impairment that is often associated with disturbance of the musculoskeletal system, and disturbance of this system can be a major cause of disability in

individuals with obesity.  The combined effects of obesity with musculoskeletal impairments can be greater than the effects of each of the impairments considered separately.  Therefore, when determining whether an individual with obesity has a listing-level impairment or combination of impairments, and when assessing a claim at other steps of the sequential evaluation process, including when assessing an individual's residual functional capacity, adjudicators must consider any additional and cumulative effects of obesity.

20 C.F.R. Part 404 Subpart P. Appendix 1, § 1.00Q.  See SSR 02-1p.  A failure to consider the impact of obesity can constitute reversible error. Barrett v. Barnhart, 355 F.3d 1065, 1068-69 (7th Cir. 2004); Clifford v. Apfel, 227 F.3d 863, 870 (7th Cir. 2000).

In this case, the ALJ erred because he did not consider the impact of Cody's obesity.  Dr. Senica indicated more than once that Cody's weight affected the severity of his arthritis symptoms.  She specifically stated in her operative notes that he had a BMI of 43.  A BMI over 30 is considered obese.  R. 554.  Cody further testified about his weight at the hearing.  The record clearly made Cody's obesity an issue, and the ALJ should have addressed it.  The decision, therefore, must be reversed because the ALJ failed to analyze all the relevant evidence.

The Commissioner argues that the ALJ indirectly considered Cody's weight because the doctors on which the ALJ relied were aware of the

weight. The Commissioner argues that any failure to address obesity directly was harmless. The Commissioner relies on the Seventh Circuit's per curiam decision in <u>Skarbek v. Barnhart</u>, 390 F.3d 500 (7th Cir. 2004). The Court in <u>Skarbek</u> held that the ALJ's failure to address the claimant's obesity was harmless error because there was no evidence to show how the obesity might affect the claimant's ability to work. <u>Id.</u> at 504. Here, however, the record contains evidence that Cody's obesity affected the severity of his impairments. Dr. Senica repeatedly indicated that Cody's obesity exasperated the effects of the arthritis in his knees. <u>R.</u> 493, 545, 554. Given the evidence in the record, the ALJ was required to address the impact of Cody's obesity at the relevant stages of the Analysis. <u>Listing</u> 1.00Q; <u>Clifford</u>, 227 F.3d at 870.

Cody also argues that the ALJ erred at Step 5 of the Analysis. The Court agrees that it cannot track the ALJ's analysis at Step 5. The ALJ should clarify Step 5 of the Analysis. The ALJ began his Analysis with Medical-Vocational Rule 201.21. That Rule applies to a person who is under the age of 50 years who is limited to sedentary work. The ALJ seemed to be saying that even if Cody's RFC should have been limited to sedentary work, he still would not be disabled at Step 5.

The ALJ, however, still needs to clarify why Rule 201.21 applies after Cody turned 50 years of age on January 6, 2006. Rules 201.13 and 201.14 apply once a person is 50 years old. 20 C.F.R. Part 404 Subpart P Appendix 2, Rules 201.13 and 201.14. Rule 201.13 applies if Cody received training in high school for direct entry into skilled work. Rule 201.14 applies if Cody did not receive such training in high school. Rule 201.13 indicates that the person is not disabled, but Rule 201.14 indicates that the person is disabled under the Rule. If the ALJ reaches Step 5 in the Analysis on remand, and if: (1) Rule 201.21 applies to Cody before he reached 50, and (2) Rule 201.14 applies once Cody reached 50 years of age, then it would seem that he should be found to be disabled at least as of his 50th birthday.

The Commissioner argues that Cody was not disabled under the Rules in any event because he had transferable skills and because the ALJ found that he had the RFC to perform light work and Rule 201.14 applies to individuals who are limited to sedentary work. Commissioner's Memorandum in Support of Motion for Summary Judgment (d/e 13), at 13-14. The problem with this argument is that the ALJ assumed that Cody had no transferable skills at Step 5, and the ALJ applied a sedentary exertional

level at Step 5.  As quoted above, the ALJ asked Gladden about the availability of jobs in the national economy after he modified the hypothetical to assume a sedentary level.  R. 671-72.  Gladden understood that modification of the hypothetical question because she only opined about jobs at the sedentary exertional level.  R. 671-72.  Furthermore, the ALJ began Step 5 of the Analysis with Rule 201.21 in his Decision.  R. 28. Rule 201.21 applies to individuals who can only work at the sedentary level and who have no transferable skills.  The fact that the ALJ: (1) found that Cody had the RFC to perform light work, but used the sedentary exertional level at Step 5; and (2) made no record regarding whether Cody had transferable skills, only demonstrates why the ALJ should clarify his Analysis at Step 5.

THEREFORE, the Plaintiff's Motion for Summary Judgment (d/e 7) is ALLOWED and the Defendant's Motion for Summary Affirmance (d/e 12) is DENIED.  The Decision of the Commissioner is reversed and remanded for further proceedings pursuant to sentence four of 42 U.S.C. § 405(g).  On remand, the ALJ should take additional testimony to clarify the matters discussed in this Opinion.

ENTERED this 6th day of October, 2010

**s/ Michael P. McCuskey**
MICHAEL P. McCUSKEY
CHIEF U.S. DISTRICT JUDGE